**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- x
JOSH APPLEBAUM, on behalf of himself and all    :
other persons similarly situated                :
                                                :        Case No. 1:16-cv-07062 (JGK)
                         Plaintiffs,            :
                                                :
      v.                                        :
                                                :
LYFT, INC.,                                     :
                                                :
                                                :
                         Defendant.             :
                                                :
------------------------------------------------------------- x
```

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LYFT, INC.'S**
**MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO DISMISS,**
**OR, IN THE ALTERNATIVE, TO STAY THIS ACTION**

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

I.    FACTUAL BACKGROUND ........................................................................................... 3

    A.    Background on Lyft's Platform and App.............................................................. 3

    B.    Using the Lyft Platform Requires Consent to Lyft's Terms of Service ................ 4

    C.    Plaintiff Agreed to the Terms of Service, Including the Mandatory Arbitration
        Provision .............................................................................................................. 6

    D.    Plaintiff Filed This Lawsuit Despite His Express Agreement to Arbitrate Any
        Disputes............................................................................................................... 6

II.    ARGUMENT .................................................................................................................. 7

    A.    The FAA Applies Because the Transaction Involved Interstate Commerce .......... 8

    B.    The FAA Applies Because A Valid and Enforceable Arbitration Agreement
        Exists Between Lyft and Plaintiff......................................................................... 9

        1.    New York law applies to determine formation of the agreement between
            Lyft and Plaintiff...................................................................................... 9

        2.    Courts in New York and nationwide routinely enforce clickwrap
            agreements ................................................................................................ 10

        3.    Plaintiff entered into a clickwrap agreement to arbitrate disputes with Lyft
            .................................................................................................................. 13

    C.    The FAA Applies Because This Dispute Falls Within the Broad Scope of the
        Arbitration Provision .......................................................................................... 16

        1.    The arbitrator should determine the "gateway" issue of arbitrability....... 16

        2.    This dispute falls within the scope of the arbitration provision............... 18

    D.    The Terms of Service Require Arbitration on an Individual Basis ...................... 19

III.    CONCLUSION.............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
    115 S. Ct. 834 (1995) ................................................................................................8

*Am. Express Co. v. Italian Colors Rest.*,
    133 S. Ct. 2304 (2013) ............................................................................................19

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ........................................................................................7, 19

*Bar-Ayal v. Time Warner Cable Inc.*,
    No. 03-cv-9905-KMW, 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006) ...................12

*Bassett v. Elec. Arts Inc.*,
    No. 13-cv-04208 (MKB) (SMG), 2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ...............2, 12

*Bekele v. Lyft*,
    No. 15-11650-FDS, 2016 WL 4203412 (D. Mass. Aug 9, 2016) ......................2, 16

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
    No. 08-cv-5463 (CM)(GWG), 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) ...........12

*Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*,
    58 F.3d 16 (2d Cir. 1995) ......................................................................................18

*Contec Corp. v. Remote Solution, Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005) ..................................................................................17

*Crawford v. Beachbody, LLC*,
    No. 14CV1583-GPC (KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ...........13

*Fieger v. Pitney Bowes Credit Corp.*,
    251 F.3d 386 (2d Cir. 2001) ....................................................................................9

*Frazier v. Lyft*,
    37-2015-00019783-CU-BT-CTL (S.D. Super. Ct. 2016) (Ajmani Decl. ¶ 11,
    Ex. 4) ...................................................................................................................2, 16

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) ......................................................11, 12, 15

*Green Tree Fin. Corp.-Ala. v. Randolph*,
    121 S. Ct. 513 (2000) ................................................................................................8

*Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*,
    246 F.3d 219 (2d Cir. 2001)......................................................................................8

*JLM Indus. V. Stolt-Nielsen SA*,
    387 F.3d 163 (2d Cir. 2004)..........................................................................18, 19, 20

*KPMG LLP v. Cocchi*,
    132 S. Ct. 23 (2011) ................................................................................................7

*Loewen v. Lyft, Inc.*,
    129 F. Supp. 3d 945 (N.D. Cal. 2015) ......................................................2, 16, 17

*Manigault v. Macy's E., LLC*,
    318 F. App'x 6 (2d Cir. 2009) ..............................................................................9, 10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    105 S. Ct. 3346 (1985) ............................................................................................8

*Moore v. Microsoft Corp.*,
    741 N.Y.S.2d 91, 92 (N.Y.App.Div.2002) ............................................................12

*Moore v. T-Mobile USA Inc.*,
    No. 10 CV 527 SLT, 2010 WL 5817656 (E.D.N.Y. Nov. 8, 2010) ......................16

*Nayal v. HIP Network Servs., IPA Inc.*,
    620 F. Supp. 2d 566 (S.D.N.Y. 2009)...................................................................20

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)............................................................................11, 12

*Orange County Choppers, Inc. v. Goen Techs. Corp.*,
    374 F. Supp. 2d 372 (S.D.N.Y. 2005) (Koeltl, J.) ...............................................18

*Paduano v. Express Scripts, Inc.*,
    55 F. Supp. 3d 400 (E.D.N.Y. 2014) ....................................................................16

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.*,
    369 F.3d 645 (2d Cir. 2004)..................................................................................18

*Philips Credit Corp. v. Regent Health Grp., Inc.*,
    953 F. Supp. 482 (S.D.N.Y. 1997) ......................................................................9, 10

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004).........................................................................2, 10, 11

*Rent-A-Ctr., W., Inc. v. Jackson*,
    130 S. Ct. 2772 (2010).........................................................................................16

*Salameno v. Gogo Inc.*,
No. 16-cv-0487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016)..............................10

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)...............................................................................7, 11

*Selden v. Airbnb, Inc.*,
No. 16-CV-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016)............................14, 15

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002)..............................................................................9, 10, 11

*Starke v. Gilt Groupe, Inc.*,
No. 13 CIV. 5497 LLS, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014)................11, 13, 14, 15

*Starkey v. G Adventures, Inc.*,
796 F.3d 193 (2d Cir. 2015)...............................................................................13

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ..............................................................12, 15

*Thomas v. Pub. Storage, Inc.*,
957 F. Supp. 2d 496 (S.D.N.Y. 2013)....................................................................7

*U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*,
101 F.3d 813 (2d Cir. 1996)...............................................................................8

*Vera v. Saks & Co.*,
335 F.3d 109 (2d Cir. 2003)...............................................................................18

*Whitt v. Prosper Funding LLC*,
No. 15-cv-136-GHW, 2015 WL 4254062 (S.D.N.Y. July 14, 2015)...................................11

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ................................................... *passim*

New York General Business Law § 349 ...............................................................6, 20

Defendant Lyft, Inc. ("Lyft"), through its undersigned counsel, submits this memorandum of law, together with the Notice of Motion and the Declarations of Amrita Ajmani and Ben Lauzier, and the exhibits annexed thereto, in support of its motion to compel arbitration and to dismiss this action, due to a mandatory individual arbitration provision, or alternatively, to stay this action pending arbitration, pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA") and Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Josh Applebaum ("Plaintiff" or "Applebaum") filed this lawsuit to litigate a dispute regarding the toll charge associated with his Lyft ride through the Holland Tunnel between New Jersey and New York City.   Notably, the Amended Complaint does not dispute that Lyft disclosed the exact amount of the charge to Plaintiff through its Terms of Service and website, nor does it plausibly allege that Lyft retained the charge Plaintiff paid.   While Plaintiff has no plausible claim against Lyft's pricing practices, as explained below, this is not the appropriate venue to resolve that issue.

When Plaintiff registered with Lyft, he affirmatively consented to Lyft's Terms of Service, which contained a provision requiring the parties to submit "any legal disputes or claims arising out of or related to the Agreement," including disputes regarding "the arbitrability of any dispute" to binding arbitration through the American Arbitration Association ("AAA").   The arbitration provision further stated that a party must bring any claim or action on an individual basis and not as "a plaintiff or class member in any purported class, collective, or representative proceeding." Plaintiff was fully aware of this requirement to arbitrate, as evidenced by his acknowledgment of it in his original complaint.   *See* Dkt. No. 1 ¶ 66.   In breach of his agreement to Lyft's Terms of Service, Plaintiff filed this lawsuit rather than a demand for arbitration with the AAA.   Plaintiff

violated the Terms of Service a second time by purporting to have filed the lawsuit on behalf of a putative class.

Lyft's arbitration provision is part of what courts call a "clickwrap" agreement, in which potential licensees are presented with a message on a screen "requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon." *Bassett v. Elec. Arts Inc.,* No. 13-cv-04208 (MKB) (SMG), 2015 WL 1298644, at *4 (E.D.N.Y. Feb. 9, 2015) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.2d 393, 429 (2d Cir. 2004)).  "Clickwrap" agreements are routinely enforced in New York and throughout the country, and this case should be no exception. Indeed, several courts have recently, and consistently, enforced the exact arbitration language to which Plaintiff consented and compelled individual arbitration of both passenger and driver claims, including those asserted in putative class actions.  *See Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945 (N.D. Cal. 2015) (compelling arbitration of driver and driver-applicant promotion claims); *Frazier v. Lyft*, 37-2015-00019783-CU-BT-CTL (S.D. Super. Ct. 2016) (compelling arbitration of passenger claims);[1] and *Bekele v. Lyft*, No. 15-11650-FDS, 2016 WL 4203412 (D. Mass. Aug 9, 2016) (compelling arbitration of driver misclassification and wage claims).  Like the Lyft users in those cases, Plaintiff affirmatively accepted Lyft's Terms of Service, and indeed consented to the same arbitration language enforced in those cases.

Likewise, terms which require that claims be arbitrated on an individual, as opposed to class wide, basis are valid and enforceable under existing Supreme Court precedent.  Given this

---

[1] In case the trial court's order compelling arbitration in *Frazier* is not easily obtainable, Lyft provides a true and correct copy of the order for the Court's convenience (Ajmani Decl. ¶ 11, Ex. 4) and respectfully requests that the Court take judicial notice of the trial court's order.  *See* CPLR 4511, subd. (a)).

precedent—and because this dispute clearly falls within the broad scope of the arbitration provision—the Court should grant Lyft's motion to compel this dispute, including any questions of arbitrability, to an individual arbitration and dismiss, or in the alternative, stay this action pending arbitration.[2]

## I.      FACTUAL BACKGROUND

### A.      Background on Lyft's Platform and App

Lyft is a mobile-based ridesharing platform (the "Lyft Platform") that allows persons who seek transportation to certain destinations ("Riders") to be matched with persons driving to or through those destinations ("Drivers").  Declaration of Ben Lauzier ¶ 2 ("Lauzier Decl.").  Through its mobile-phone application (the "Lyft App"), Lyft offers information and a method to connect Drivers and Riders with each other, but it does not provide transportation services itself.  *Id*.  When in need of a ride, Riders open the Lyft App on their mobile phone, and use the Lyft Platform to request a ride from a nearby Driver.  *Id*.  Nearby Drivers are then notified of the request, and the first Driver to accept the request is matched with the Rider and may proceed to pick up and transport the Rider to his or her desired destination.  *Id*.  After a ride is over, Riders use the Lyft App to electronically transmit payment via the Internet.  *Id*.

---

[2] Lyft respectfully requests that this Court compel this dispute to arbitration, but if this Court denies that request, Lyft intends to file a motion under Rule 12 of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction based upon Plaintiffs' lack of standing and failure to state a claim upon which relief can be granted.

**B.      Using the Lyft Platform Requires Consent to Lyft's Terms of Service**

The only way users can access the Lyft Platform and arrange for transportation is by downloading the Lyft App on their mobile device and registering.   Lauzier Decl. ¶ 2.   The following describes the registration by which Plaintiff registered for Lyft in April 2016.   *Id.* ¶ 6.

After downloading and then opening the Lyft App, users were prompted to supply their first and last name, email address, and phone number.   *Id.* ¶ 4.   Users were also asked to supply payment information (a credit card or Pay Pal account); however, users could also choose to temporarily bypass this step until they requested a ride.   *Id.*   After successfully entering a credit card or bypassing the credit card screen, users were presented with a screen, like the following, with a consent box assenting to the statement "I agree to Lyft's Terms of Service."   *Id.* ¶ 6.



In order to click "Next" and proceed to use the Lyft App and the Lyft Platform, users were required to affirmatively click the box adjacent to the statement "I agree to Lyft's Terms of Service" and agree to the Terms of Service Agreement ("Terms of Service"). *Id*. The phrase "Terms of Service" was highlighted in blue and linked directly to Lyft's Terms of Service. *Id*. Clicking on the "Terms of Service" hyperlink directed users to a page containing the Terms of Service, which users had the opportunity to scroll through and review. *Id*. Users could not click "Next" and complete the registration process if they did not click the box manifesting their agreement to the Terms of Service. *Id*.

Within Lyft's Terms of Service was a mandatory arbitration provision. This provision stated:

> **Agreement to Arbitrate All Disputes and Legal Claims.**
> You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules (a copy of which can be obtained here), or as otherwise mutually agreed by you and we. Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be brought within the time required by applicable law. You and we agree that any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding.
>
> YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

Declaration of Amrita Ajmani, ¶¶ 5, 8, Ex. 2 at 15 ("Ajmani Decl.") (all emphasis in original; "here" is highlighted and hyperlinked).

### C.   Plaintiff Agreed to the Terms of Service, Including the Mandatory Arbitration Provision

When a user electronically accepts Lyft's Terms of Service by clicking "I agree," Lyft is notified of the date and time that the user accepted the Terms of Service Agreement.  Ajmani Decl. ¶ 3.  According to Lyft's records, Plaintiff successfully registered and accepted Lyft's Terms of Service on April 6, 2016.  *Id.* ¶ 4, Ex. 1.  The Terms of Service in effect on April 6, 2016 was dated February 8, 2016.  *See id.* ¶¶ 5-6 & Exs. 1-2.  This version, and Plaintiff's affirmative consent to it, was in effect on the date that Plaintiff first filed suit on September 9, 2016.  *Id.* ¶ 5.

### D.   Plaintiff Filed This Lawsuit Despite His Express Agreement to Arbitrate Any Disputes

Despite the mandatory arbitration agreement in the Terms of Service to which he agreed, on September 9, 2016, Plaintiff breached the February 8, 2016 Terms of Service when he commenced this action by filing a Class Action Complaint (the "Complaint") against Lyft.  Dkt. No. 1 ("Compl.").  The Complaint included six claims, all of which were predicated upon the bald (and false) allegation that Plaintiff had been overcharged as a result of alleged non-compliance with certain New York City Taxi and Limousine Commission Rules and Regulations (the "TLC Regulations") regarding the New York MTA Bridges & Tunnels E-Z Pass® ("E-Z Pass®").  *See, e.g.*, Compl. ¶¶ 1, 89, 97, 112, 119, 130, 141.  Shortly after the Complaint was filed, Lyft sent Plaintiff's counsel a letter, which outlined Lyft's indisputable compliance with the relevant regulations and demanded that Plaintiff voluntarily dismiss Lyft from this action.  Thereafter, the parties engaged in a series of meet and confers and, on October 31, 2016, Plaintiff filed an Amended Class Action Complaint (the "Amended Complaint"), re-writing his theory and withdrawing the regulatory-violation allegations entirely.  *See* Dkt. Nos. 15, 17 ("Am. Compl.").

The Amended Complaint acknowledges that Lyft disclosed the relevant surcharges and tolls in its Terms of Service (Am. Compl. ¶ 3), but asserts that Plaintiff was somehow deceived by an after-the-fact receipt, which did not state whether the listed toll charge for the Holland Tunnel represented "the discounted E-Z Pass rate or the full cash rate." *Id.* ¶ 5. Based upon these facts, Plaintiff alleges that Lyft violated New York General Business Law § 349 by purportedly "taking steps to prevent Plaintiff . . . from learning that [he] ***had been***" charged the cash rate, as opposed to the discounted E-Z Pass rate for a drive that passed through the Holland Tunnel. *Id.* ¶ 39 (emphasis added). The Amended Complaint also includes a duplicative claim for unjust enrichment based on the same facts. *Id.* ¶¶ 45-50. Plaintiff purports to bring these claims on behalf of himself and a putative class of "similarly situated individuals." *Id.* ¶ 27.

Because Plaintiff is required to arbitrate any disputes "arising out of or related to" Lyft's Terms of Service, which includes a section governing payments of "applicable fees, tolls, surcharges, and taxes as set forth on your market's Lyft Cities page (http://www.lyft.com/cities)" (Ajmani Decl. ¶¶ 5, 9, Ex. 2 at 2-3), Lyft brings the instant motion to compel arbitration, and to dismiss, or in the alternative, to stay, this action. *See Thomas v. Pub. Storage, Inc.*, 957 F. Supp. 2d 496, 499 (S.D.N.Y. 2013) ("Once a court is satisfied that an arbitration policy is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate.").

## II.   ARGUMENT

Congress enacted the FAA to reverse longstanding judicial hostility to arbitration agreements and to place them on an equal footing with other contracts. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). The Supreme Court has repeatedly emphasized that courts are obligated to enforce arbitration agreements as written because the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution." *See, e.g.*, *KPMG LLP v. Cocchi*,

132 S. Ct. 23, 25 (2011) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 105 S. Ct. 3346, 3356 (1985)).  "[T]his policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Thus, under the FAA, a court must compel arbitration if it finds that: (1) the transaction involves interstate commerce, (2) a written arbitration agreement exists between the parties, and (3) the dispute falls within the scope of the agreement.  *See Mitsubishi Motors*, 105 S. Ct. at 3353; *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001).  "If a party refuses to arbitrate, arbitrability of the dispute hinges only on whether there is an agreement to arbitrate and, if so, whether the dispute falls within that agreement." *U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*, 101 F.3d 813, 816 (2d Cir. 1996).  The party opposing enforcement of the arbitration agreement bears the burden of proving that the claims are not subject to arbitration.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 121 S. Ct. 513, 522-23 (2000).

## A.    The FAA Applies Because the Transaction Involved Interstate Commerce

"[C]ontracts . . . implicat[ing] interstate commerce . . . [are] subject[] to the reach of the FAA." *See Allied-Bruce Terminix Cos. v. Dobson*, 115 S. Ct. 834, 839-41 (1995) (FAA should be applied coincident with the full reach of Congress's Commerce Clause powers); *see also* 9 U.S.C. § 2 ("A written [arbitration] provision in any . . . contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."); 9 U.S.C. § 1 (defining "commerce" as "commerce among the several States").

The transaction at issue in this case easily satisfies the FAA's "involving interstate commerce" requirement.  Plaintiff is a resident of New York (Am. Compl. ¶ 7), while Lyft is a Delaware corporation with its principal place of business in San Francisco, California.  *Id*. ¶ 8. The Lyft Platform uses the Internet to transmit requests from riders across a network of independent drivers in a number of different states, and all transactions are processed electronically.  Lauzier Decl. ¶ 3.  In fact, the claims made in this lawsuit directly involve interstate commerce:  Plaintiff used the Lyft Platform to obtain interstate transportation between downtown Manhattan in New York and Newark Airport in New Jersey.  *See* Am. Compl. ¶ 24.  Because the Lyft Terms of Service were entered into between citizens of different states and cover the use of an Internet application that impacts interstate commerce, the first element of the FAA test is met. *See, e.g.*, *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 n.11 (2d Cir. 2002).

## B.   The FAA Applies Because A Valid and Enforceable Arbitration Agreement Exists Between Lyft and Plaintiff

### 1.   New York law applies to determine formation of the agreement between Lyft and Plaintiff

To determine whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts."  *Manigault v. Macy's E., LLC*, 318 F. App'x 6, 7 (2d Cir. 2009) (quoting *First Options of Chi., Inc. v. Kaplan*, 115 S. Ct. 1920, 1924 (1995)).  In a diversity case, a federal court must follow the prevailing rules of the state where it sits in analyzing preliminary choice-of-law questions.  *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001).

"New York's choice-of-law rules 'require[ ] application of the law of the state having the most significant contacts with the matter in dispute."  *Philips Credit Corp. v. Regent Health Grp., Inc.*, 953 F. Supp. 482, 501 (S.D.N.Y. 1997) (citing *Auten v. Auten*, 308 N.Y. 155, 160 (1954)). The relevant contacts include:  (1) the place of contracting, (2) the place of the contract

negotiations, (3) the place of the performance of the contract, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Philips Credit*, 953 F. Supp. at 502.

These factors favor application of New York law to the arbitration provision in the Terms of Service.  As previously noted, Plaintiff is a resident of the State of New York. Am. Compl. ¶ 7.  Accordingly, the contract was likely entered into in New York.  *Id*.  The allegations arise out of events performed in New York and New Jersey, *see id.* ¶¶ 9-11, and are specifically directed at Lyft's practice of charging toll fees to cross bridges and tunnels in the New York City metropolitan area.  *E.g.*, *id.* ¶ 1.  Further, the allegations emphasize the volume of business Lyft conducts in New York City.  *Id.* ¶ 15.  Finally, the Amended Complaint asserts at least one claim under New York state law and does not expressly invoke the laws of any other state law.  *Id.* ¶¶ 35-44.  While California has an interest because Lyft is a resident there, and New Jersey has an interest as some of the events underlying the allegations occurred there, New York is the "state having the most significant contacts with the matter in dispute."  *Philips Credit*, 953 F. Supp. at 501.  Therefore, New York law should apply to the Court's analysis of the validity of the agreement to arbitrate between Plaintiff and Lyft.

### 2.    Courts in New York and nationwide routinely enforce clickwrap agreements

New York contract law provides that "[a] contract may be formed by words or by conduct that demonstrate the parties' mutual assent." *Manigault*, 318 F. App'x at 7.  "A 'transaction,' even if created online, 'in order to be a contract, requires a manifestation of agreement between the parties' as to its terms." *Salameno v. Gogo Inc.*, No. 16-cv-0487, 2016 WL 4005783, at *4 (E.D.N.Y. July 25, 2016) (quoting *Specht*, 306 F.3d at 28); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts

to many new situations, it has not fundamentally changed the principles of contract.").  In other words, regardless of whether a transaction occurs in person or online, "mutual manifestation of assent" is the "touchstone of contract."  *Specht*, 306 F.3d at 29; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) ("Manifestation of assent to an online contract is not meaningfully different, and can be accomplished by 'words or silence, action or inaction,' so long as the user 'intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.") (quoting *Schnabel*, 697 F.3d at 120).

"[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance."  *Whitt v. Prosper Funding LLC*, No. 15-cv-136-GHW, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (quoting *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *2 (S.D.N.Y. Apr. 24, 2014)).  "One manner of demonstrating such constructive knowledge is to affirmatively click a box on [a] website acknowledging awareness of and agreement to the terms of [a contract] before ... [being] allowed to proceed with further utilization of the website, thereby executing a 'clickwrap' agreement."  *Whitt*, 2015 WL 4254062, at *4 (internal quotations and citation omitted).  As the Second Circuit has explained, "clickwrap" agreements are those that utilize an "I agree" button to "force users to 'expressly and unambiguously manifest either assent or rejection prior to being given access to the product.'"[3]

---

[3] As the Second Circuit further acknowledged, "clickwrap" agreements are distinguishable from "'browsewrap' agreements[, which] involve terms and conditions posted via hyperlink, commonly at the bottom of the screen, and do not request an express manifestation of assent." *Nicosia v. Amazon.com, Inc.*, 834 F.3d at 233 (citing *Specht*, 306 F.3d at 31-32).

*Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012) (quoting *Register.com*, 356 F.3d at 429). In other words, by definition, a user who enters into a clickwrap agreement has necessarily received actual or constructive notice of the conditions and manifested assent to those conditions.[4]

Accordingly, "[i]n New York, clickwrap agreements are valid and enforceable contracts." *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.,* No. 08-cv-5463 (CM)(GWG), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (citing *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92 (N.Y.App.Div.2002); *People ex. rel Spitzer v. Direct Revenue, LLC*, 2008 WL 1849855, at *4 (N.Y.Sup.Ct. Mar. 12, 2008)); *Fteja*, 841 F. Supp. 2d at 837 ("[C]lickwrap agreements have been routinely upheld by circuit and district courts;" noting that "courts in this Circuit" have enforced clickwrap agreements). And courts applying the law of New York (and the law of other states that similarly require mutual manifestation of intent) routinely uphold the enforceability of clickwrap agreements in which terms are presented via hyperlink and users must affirmatively click an "I agree" box assenting to those terms. *See, e.g.*, *Bassett*, 2015 WL 1298644, at *4 (enforcing clause contained in clickwrap agreement where defendant clicked button stating "I Have Read and Accept Both Documents" which appeared next to button hyperlinked to Terms of Service); *Fteja*, 841 F. Supp. 2d at 837 (holding that plaintiff assented to terms of use and forum selection clause it

---

[4] The Second Circuit has made clear that "to be bound, an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia*, 834 F.3d at 232. Consequently, "an individual who signs or otherwise assents to a contract without reading it (despite having an opportunity to do so) is bound by that contract, including its arbitration provision." *Bar-Ayal v. Time Warner Cable Inc.*, No. 03-cv-9905-KMW, 2006 WL 2990032, at *8 (S.D.N.Y. Oct. 16, 2006).

contained when he clicked "Sign Up" button immediately above hyperlink to terms of service); *Starke*, 2014 WL 1652225, at *1 (enforcing arbitration clause in hyperlinked Terms of Use); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) ("[C]lickwrap presentations providing a user with access to the terms of service and requiring a user to affirmatively accept the terms, even if the terms are not presented on the same page as the acceptance button, are sufficient"); *Crawford v. Beachbody, LLC*, No. 14CV1583-GPC (KSC), 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (such assent "constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I Accept' button and clicks that button"); *see also Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197 n. 3 (2d Cir. 2015) (enforcing forum selection clause accessible through a hyperlink in emails sent to plaintiff following purchase, but noting that it would have been "simpler to resolve" the question of the enforceability of the hyperlinked terms and conditions "had [defendant] used a 'clickwrap' mechanism to provide reasonable notice and to obtain [plaintiff's] assent").

### 3. Plaintiff entered into a clickwrap agreement to arbitrate disputes with Lyft

On April 6, 2016, Plaintiff affirmatively assented to the operative Terms of Service through a clickwrap agreement presented on a mandatory screen, like the following, in which he clicked the box next to "I agree to Lyft's Terms of Service" and then clicked "Next."  Ajmani Decl. ¶¶ 3, 4, Ex. 1; Lauzier Decl. ¶ 6.



As the picture above illustrates, the box that Plaintiff clicked was directly next to the phrase "I agree to Lyft's Terms of Service."  Lauzier Decl. ¶ 6; *see Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (recognizing that agreements "tend to be enforced if the hyperlinked terms and conditions is next to the only button that will allow the user to continue use of the website.") (internal quotations and citation omitted); *Starke*, 2014 WL 1652225, at *2–3 (arbitration clause in "terms of use" binding where consumer clicked "Shop Now" button next to statement that informed user that "the consumer will become a Gilt member and agrees to be bound by the "Terms of Membership," which were available next to the button as a hyperlink).[5]

---

[5] Indeed, the checkbox unambiguously expresses consent to "Lyft's Terms of Service," even

The first four words of the sentence ("I agree to Lyft's") were in dark grey text, in contrast to the page's white background.  Lauzier Decl. ¶ 6.  And the phrase "Terms of Service" was conspicuously highlighted in bright blue and provided a hyperlink to the Terms of Service.  *Id*. The complete phrase, "I agree to Lyft's Terms of Service," was offset from the rest of the text on the page, ensuring that user attention was not diverted.  *Id*.; *see also Selden*, 2016 WL 6476934, at *5 (user was on notice of conspicuous terms where text stating "I agree to Airbnb's Terms of Service" was in the middle of the sign-up screen, in close proximity to … the sign-up buttons" and "appeared in dark font, in sharp contrast to the white background.").

In sum, the sign-up page was simple and straightforward; it contained a mere twenty words total, with a single box and just a single hyperlink (to the Terms of Service).  Lauzier Decl. ¶ 6; *see also Swift*, 805 F. Supp. 2d at 912 (arbitration clause enforceable where user clicked on button marked "I accept" above statement in small grey font indicating that clicking on the button meant accepting the hyperlinked "terms of service").  Plaintiff was directed exactly where to click to review the Terms of Service, and his decision to click the "I agree to the Terms of Service" box represented his assent to those terms.  Lauzier Decl. ¶ 6.

Furthermore, the Terms of Service that Plaintiff accepted contained several large headings that direct the reader to important provisions, including the mandatory arbitration provision that appeared separately and conspicuously under its own bold heading that was larger than the surrounding text:  **"Agreement to Arbitrate All Disputes and Legal Claims."**  Ajmani Decl. ¶¶

---

more clearly than the button in *Selden* (where consent was established by clicking a button stating "Sign up with Facebook"), *Fteja* (where consent was established by clicking a button stating "Sign Up"), and *Starke* (where consent was established by clicking a button stating "Shop Now").

5, 8, Ex. 2 at 15.  There are no hidden terms in smaller print.  *Id*.  To the contrary, the Terms of Service's arbitration provision, which is presented in its entirety in Section I.C., above, conspicuously provides, in all capital letters:  "YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY." *Id.*  As such, the arbitration provision in the Terms of Service is conspicuous and unambiguous—a determination supported by the rulings of each of the three other courts that have addressed this exact same arbitration provision.  *See Bekele v. Lyft*, 2016 WL 4203412; *Frazier v. Lyft*, 37-2015-00019783-CU-BT-CTL (S.D. Super. Ct. 2016) (Ajmani Decl. ¶ 11, Ex. 4); *Loewen v. Lyft*, 129 F. Supp. 3d 945.

## C.   The FAA Applies Because This Dispute Falls Within the Broad Scope of the Arbitration Provision

### 1.   The arbitrator should determine the "gateway" issue of arbitrability

Because Plaintiff agreed to the arbitration provision, the remaining question is whether the dispute falls within the scope of the provision.  This is commonly referred to as an "issue of arbitrability."  Where parties "clearly and unmistakably" indicate their intent to delegate these issues to the arbitrator, the arbitrator – and not the court – must decide them.  *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772, 2784 (2010); *Moore v. T-Mobile  USA Inc.*, No. 10 CV 527 SLT, 2010 WL 5817656, at *3 (E.D.N.Y. Nov. 8, 2010), *report and recommendation adopted*, No. 10-CV-527 SLT CLP, 2011 WL 609818 (E.D.N.Y. Feb. 15, 2011).  And the party opposing arbitration bears the heavy burden of establishing that the assertion of arbitrability is "wholly groundless." *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 424 (E.D.N.Y. 2014); *Loewen*, 129 F. Supp. 3d at 951 (N.D. Cal. 2015) ("Where a contract delegates the question of arbitrability to an arbitrator, the court's inquiry is limited to whether the demand for arbitration is 'wholly groundless.'").

Here, the arbitration provision expressly delegates gateway questions of arbitrability to the arbitrator.  Ajmani Decl. ¶¶ 5, 8, Ex. 2 at 15 ("You and We agree that any legal disputes or claims arising out of or related to the [Terms of Service] (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the [Terms of Service], or the arbitrability of any dispute)."  Indeed, the federal court that analyzed this arbitration language found that Lyft's arbitration provision "reveal[ed] the parties' clear and unmistakable intent to delegate the threshold question of arbitrability to the arbitrator."  *See Loewen*, 129 F. Supp. 3d at 954.  Further confirming the parties' agreement to delegate issues of arbitrability to the arbitrator is the express incorporation of the AAA Commercial Arbitration Rules in the arbitration provision.[6]  Ajmani Decl. ¶¶ 5, 8, Ex. 2 at 15 ("The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules . . . .").  The Second Circuit has held that incorporation of the AAA Rules "serves as clear and unmistakable evidence of the parties' intent to delegate [issues of arbitrability] to an arbitrator."  *See Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).

Because there is a clear and unmistakable delegation by the parties, and because Lyft's claim of arbitration is not "wholly groundless," the Court should compel arbitration of this dispute, including any issues of arbitrability, to an arbitrator.

---

[6] AAA Commercial Arbitration Rule 7 provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  *See* https://www.adr.ory/aaa/ShowPropertvrnodekC/UCM/ADRSTG 004103&revision=latestreleased.

17

### 2. This dispute falls within the scope of the arbitration provision

Even if the Court were to reach questions about the scope of the arbitration provision, it would undoubtedly find that this dispute is encompassed within its scope.  The arbitration provision provides for the arbitration of "any legal disputes or claims arising out of or related to the [Terms of Service] (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the [Terms of Service], or the arbitrability of any dispute)."  Ajmani Decl. ¶¶ 5, 8, Ex. 2 at 15.  The Second Circuit has held that arbitration provisions that closely resemble this provision are "broad" in scope.  *See, e.g.*, *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.*, 369 F.3d 645, 649, 654 (2d Cir. 2004); *Vera v. Saks & Co.*, 335 F.3d 109, 117 (2d Cir. 2003); *Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*, 58 F.3d 16, 19-20 (2d Cir. 1995).

This "broad" arbitration provision encompasses within its scope any dispute in which the factual allegations underlying the plaintiff's claims "touch matters" covered by the parties' agreement.  *See JLM Indus. V. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004).  Accordingly, any such disputes must be arbitrated.  *Id; see also Orange County Choppers, Inc. v. Goen Techs. Corp.*, 374 F. Supp. 2d 372, 374 (S.D.N.Y. 2005) (Koeltl, J.) ("The existence of a broad arbitration clause creates a presumption of arbitrability which can be overcome only if it may be said with positive assurance that the arbitration clause is not susceptible to the interpretation that it covers the asserted dispute.").

There is no question that the dispute here is encompassed by the broad arbitration provision in Lyft's Terms of Service.  The Amended Complaint challenges the amount that Plaintiff was charged pursuant to the "Payments" section of Lyft's Terms of Service, which provides, among other things:

> As a Rider, you agree that any amounts charged following a ride (a

18

"Charge") are mandatory and due and payable immediately upon completion of the ride. Charges include Ride Fees and other applicable fees, tolls, surcharges, and taxes as set forth on your market's Lyft Cities page (https://www.lyft.com/cities), plus any tips to the Driver that you elect to pay. . . . You are responsible for reviewing the applicable Lyft Cities page and shall be responsible for all Charges incurred under your User account regardless of your awareness of such Charges or the amounts thereof.

. . .

Other charges. Other fees, tools, and surcharges may apply to your ride, including actual or anticipated airport fees, state or local fees, tolls (and return tolls in select instances), and process fees for split payments. In addition, where required by law, Lyft will collect applicable taxes. See your market's Lyft Cities page for details on other Charges that may apply. Any tips will be provided entirely to the applicable Driver.

*See* Ajmani Decl. ¶¶ 5, 9, Ex. 2 at 2-3.

Accordingly, Plaintiff's claims are well within the scope of the arbitration clause. And even if there were room for doubt, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Stolt-Nielsen*, 387 F.3d at 171 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 103 S. Ct. 927, 941 (1983)). These straightforward facts, combined with the strong national policy favoring arbitration, lead to a single conclusion: Plaintiff's claims against Lyft are improperly before this Court and should be arbitrated pursuant to the parties' agreement.

### D.    The Terms of Service Require Arbitration on an Individual Basis

Finally, the express language of the Terms of Service requires disputes to be arbitrated on an individual basis. The Supreme Court has held, and New York courts have recognized, that class action waivers are valid and enforceable as a matter of preemptive federal law under the FAA. *See, e.g.*, *AT&T Mobility*, 131 S. Ct. at 1753; *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2308 (2013) (holding that under the FAA, class action waivers must be enforced according

19

to their terms); *Stolt-Nielsen*, 559 U.S. at 683 ("[P]arties may specify *with whom* they choose to arbitrate their disputes.") (emphasis in original); *Nayal v. HIP Network Servs., IPA Inc.*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009) (concluding that arbitration agreement which effectively barred class actions was enforceable as to claims asserted under General Business Law § 349).

Here, the arbitration agreement clearly and unambiguously states that "any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding." Ajmani Decl. ¶¶ 5, 8, at Ex. 2 at 15. Further, "[t]he arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding." *Id*. Finally, the arbitration agreement states in all capital letters: "YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING." *Id*. Given this unambiguous class action waiver, arbitration must proceed on an individual basis.

## III.    CONCLUSION

For the foregoing reasons, Lyft respectfully requests that the Court grant its motion to compel arbitration on an individual basis and dismiss the action, or alternatively, to stay this action pending arbitration.

Dated:  December 2, 2016

Respectfully submitted,

WINSTON & STRAWN LLP
By:  *s/ Jeffrey J. Amato*

Jeffrey J. Amato
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
jamato@winston.com

Amanda L. Groves *(pro hac vice pending)*
WINSTON & STRAWN LLP
100 North Tryon Street
Charlotte, NC 28202-1078
Telephone: (704) 350-7755
agroves@winston.com

Sean D. Meenan *(pro hac vice pending)*
WINSTON & STRAWN LLP
101 California St.
San Francisco, CA 94111
Telephone: (415) 591-1000
smeenan@winston.com

*Attorneys for Defendant Lyft, Inc.*

21