**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

APPLEBAUM, *on Behalf of Himself and*
*All Other Persons Similarly*
*Situated*,

                 **Plaintiff,**

    - against -

LYFT, INC.,

                 **Defendant.**

16-cv-07062 (JGK)

OPINION AND ORDER

---

**JOHN G. KOELTL, District Judge:**

The defendant, Lyft, Inc. ("Lyft"), is a transportation company that connects consumers to drivers through its mobile application (the "Lyft App"). The plaintiff, Josh Applebaum, on behalf of a purported class alleges that Lyft overcharges its New York City metropolitan area consumers by charging them the non-discounted cash price for tolls, as opposed to the discounted rate that Lyft's drivers may receive by using "E-Z Pass." The plaintiff has asserted claims for violation of N.Y. Gen. Bus. L. § 349 and unjust enrichment. Lyft has moved to dismiss or, in the alternative, stay the action, and to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 <u>et seq.</u>

The plaintiff alleges diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Am. Compl. ¶ 9.

## I.

The following facts are taken from the parties'
submissions.

Lyft is a Delaware company with its principal place of
business in California. Am. Compl. ¶¶ 1, 8. Lyft "facilitates
peer-to-peer ridesharing by connecting passengers who need a
ride with available Lyft drivers" through the Lyft App, which is
available for download on smartphones. Am. Compl. ¶¶ 2, 13. Lyft
charges consumers for rides "using Lyft's rates plus additional
rates, if applicable, such as surcharges and tolls." Am. Compl.
¶ 17.

The plaintiff is a citizen of New York. Am. Compl. ¶ 7. The
plaintiff alleges that bridges and tunnels in the New York City
metropolitan area charge tolls at two rates, a non-discounted
cash rate and a discounted rate for drivers that use the "E-Z
Pass electronic toll collection system," which automatically
charges drivers each time they drive through a tunnel or bridge.
Am. Compl. ¶¶ 19-20.

The plaintiff alleges that, on May 30, 2016, he used the
Lyft App to arrange a ride from New York City to New Jersey. Am.
Compl. ¶ 24. The plaintiff alleges that Lyft overcharged him by
$2.50 because he was charged the non-discounted cash rate of
$15.00 for the "Holland Tunnel toll," instead of the discounted
"E-Z Pass rate" of $12.50 that his driver actually paid. Am.

2

Compl. ¶ 25. The plaintiff claims that Lyft misled consumers ---
including the plaintiff himself --- into believing that they
would be charged the discounted rate. Am. Compl. ¶ 32.

To connect to a driver through Lyft, the plaintiff had to
first download the Lyft App and register with Lyft, including by
creating a registered profile. Lauzier Decl. ¶¶ 2, 4. The Lyft
App is free to download; a consumer will not be charged until
after the consumer creates a registered profile and connects to
a driver through the Lyft App.

On or around April 6, 2016 --- before the alleged
overcharge --- the plaintiff created his registered profile.
Ajmani Decl. ¶ 4. At the time, the registration process required
the plaintiff to input certain information into a series of
screens presented on his smartphone. Applebaum Decl. ¶ 3. The
plaintiff was asked to provide Lyft with certain information,
such as his name and e-mail address. Lauzier Decl. ¶ 4. The
plaintiff was also asked to supply payment information (for
example, a credit card number); however, the plaintiff had the
option of temporarily bypassing this step until he first
requested a ride. Lauzier Decl. ¶ 4. Eventually, the plaintiff
was presented with the following screen[1]:

---

[1] The screens in this Opinion and Order are not reproduced to
scale. The appearance of any screen might differ for a consumer
in certain irrelevant respects depending upon certain factors,



Lauzier Decl. ¶ 6. The plaintiff could not click the pink "Next" bar (which was necessary to create a registered profile) until he entered his phone number into the "Phone" field and clicked the box (the "Box") adjacent to the phrase "I agree to Lyft's Terms of Services." Lauzier Decl. ¶¶ 4, 6. The plaintiff entered his phone number and clicked the Box as part of the registration process. Ajmani Decl. ¶ 4.

The light blue-texted "Terms of Services" hyperlinked to a separate scrollable page containing Lyft's "February 8, 2016 Terms of Services." Ajmani Decl. ¶ 4; Ajmani Decl., Ex. 2 (The February 8, 2016 Terms of Services); Lauzier Decl. ¶ 6. Clicking the hyperlink was not required to create the registered profile;

such as the type of smartphone the consumer used and the consumer's mobile service provider.

indeed, the plaintiff swears that he did not read the February 8, 2016 Terms of Services, and that he did not at the time knowingly agree to any arbitration agreement. Applebaum Decl. ¶¶ 5-6.

The February 8, 2016 Terms of Services provided that: "THIS FOLLOWING USER AGREEMENT DESCRIBES THE TERMS AND CONDITIONS ON WHICH LYFT, INC. OFFERS YOU ACCESS TO THE LYFT PLATFORM." Ajmani Decl., Ex. 2 at 1. The contract defined the "Lyft Platform" as the "Lyft application, website, and technology platform." Ajmani Decl., Ex. 2 at 1.

Paragraph 17 of the contract entitled "**Agreement to Arbitrate All Disputes and Legal Claims**" provided:

> You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules (a copy of which can be obtained here), or as otherwise mutually agreed by you and we. Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be brought within the time required by applicable law. You and we agree that any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise

preside over any form of a representative, collective, or class proceeding.

YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

Ajmani Decl. ¶ 8. The pink-texted "here" hyperlinked to the American Arbitration Association's Commercial Arbitration Rules. Ajmani Decl., Ex. 2 ¶ 17.

The screen that the plaintiff saw on April 6, 2016 with the header **"Add phone number"** and the hyperlink to the February 8, 2016 Terms of Service represented a marked departure from the previous ways in which Lyft presented its contracts to consumers. For example, a consumer registering with Lyft in 2014 would have been presented at some point during that registration process with the following screen containing Lyft's July 28, 2014 Terms of Service:



Weiss Decl. ¶ 2; Weiss Decl., Ex. A at 4 (noting the date of the applicable Terms of Service). This screen contained the entire July 28, 2014 Terms of Service and was scrollable, meaning that a consumer could read the entire contract without clicking any hyperlinks. Weiss Decl. ¶ 2. A consumer could not register with Lyft without clicking the teal "I accept" bar. Weiss Decl. ¶ 2.

The plaintiff initiated this action on September 9, 2016. Weiss Decl. ¶ 2.

Lyft updated its Terms of Service on September 30, 2016. Ajmani Decl., Ex. 3 (The September 30, 2016 Terms of Service). Any existing Lyft customer (such as the plaintiff) that accessed the Lyft App after the update was automatically presented with

the following screen containing Lyft's September 30, 2016 Terms
of Service:



    Laufer-Edel Reply Decl. ¶ 2. Lyft's method of presenting
the September 30, 2016 Terms of Service to its existing
customers who had already registered with Lyft resembles Lyft's
2014 method for presenting its contracts to new customers during
the initial 2014 registration process. The screen contained the
entire September 30, 2016 Terms of Service and was scrollable.
Laufer-Edel Reply Decl. ¶ 3. An existing Lyft customer could not
book a ride after September 30, 2016 unless the customer clicked
the pink "I accept" bar. Laufer-Edel Reply Decl. ¶ 3.

As reflected in the above image, the screen that a customer saw after the update (in other words, without any scrolling) stated in its header: "Before you can proceed you must read & accept the latest Terms of Service." The screen also stated the following regarding arbitration:

PLEASE BE ADVISED: THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS YOU AND LYFT HAVE AGAINST EACH OTHER CAN BE BROUGHT (SEE SECTION 17 BELOW). THESE PROVISIONS WILL, WITH LIMITED EXCEPTION, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING. AS A DRIVER, YOU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTION 17.

A customer could click the light blue-texted "SEE SECTION 17 BELOW" to jump to paragraph 17 of the September 30, 2016 Terms of Service entitled "**DISPUTE RESOLUTION AND ARBITRATION AGREEMENT**" (alternatively, the customer could scroll through the contract to read that paragraph). Ajmani Decl., Ex. 3 at 1.

Paragraph 17 set forth extensive information related to the arbitrability of any claims involving Lyft. Paragraph 17(a), which was sub-titled "**Agreement to Binding Arbitration Between You and Lyft**," provided:

YOU AND LYFT MUTUALLY AGREE TO WAIVE OUR RESPECTIVE RIGHTS TO RESOLUTION OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY AND AGREE TO RESOLVE ANY DISPUTE BY ARBITRATION, as set forth below. This agreement to arbitrate ("Arbitration Agreement") is governed by the Federal Arbitration Act and survives after the Agreement terminates or your relationship with Lyft ends. ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE

9

PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. Except as expressly provided below, this Arbitration Agreement applies to all Claims (defined below) between you and Lyft, including our affiliates, subsidiaries, parents, successors and assigns, and each of our respective officers, directors, employees, agents, or shareholders.

Except as expressly provided below, ALL DISPUTES AND CLAIMS BETWEEN US (EACH A "CLAIM" AND COLLECTIVELY, "CLAIMS") SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT. These Claims include, but are not limited to, any dispute, claim or controversy, whether based on past, present, or future events, arising out of or relating to: this Agreement and prior versions thereof (including the breach, termination, enforcement, interpretation or validity thereof), the Lyft Platform, the Services . . . your relationship with Lyft . . . payments made by you . . . unfair competition . . ., claims arising under federal or state consumer protection laws . . . and state statutes, if any, addressing the same or similar subject matters, and all other federal and state statutory and common law claims. All disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator, except as expressly provided below.

BY AGREEING TO ARBITRATION, YOU UNDERSTAND THAT YOU AND LYFT ARE WAIVING THE RIGHT TO SUE IN COURT OR HAVE A JURY TRIAL FOR ALL CLAIMS, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS ARBITRATION AGREEMENT. This Arbitration Agreement is intended to require arbitration of every claim or dispute that can lawfully be arbitrated, except for those claims and disputes which by the terms of this Arbitration Agreement are expressly excluded from the requirement to arbitrate.

Ajmani Decl., Ex. 3 ¶ 17(a). Paragraph 17 set forth other

information related to the resolution of disputes with Lyft,

such as the "Prohibition of Class Actions and Non-Individualized

Relief," "Rules Governing the Arbitration," "Arbitration Fees and Awards," "Location and Manner of Arbitration," and "Optional Pre-Arbitration Negotiation Process." <u>See</u> Ajmani Decl., Ex. 3 ¶ 17(b-i).

The plaintiff accessed the Lyft App on November 22, 2016, and clicked "I accept" when he was presented with the screen containing the September 30, 2016 Terms of Service. Ajmani Reply Decl. ¶ 3.

Lyft initially moved to compel arbitration based on the February 8, 2016 Terms of Service. In their briefing on that motion, Lyft argued for the first time in its reply papers that the plaintiff's acceptance of the September 30, 2016 Terms of Service showed that the plaintiff had no opposition to arbitrating his claims pursuant to the February 8, 2016 Terms of Service. Lyft Reply Mem. at 10. On March 17, 2017, this Court ordered supplemental briefing on whether the plaintiff had agreed to arbitrate his claims pursuant to his alleged acceptance of the September 30, 2016 Terms of Service. <u>See</u> Dkt. 42.

This case thus presents two issues: First, whether the plaintiff agreed to arbitrate his claims pursuant to the February 8, 2016 Terms of Service; and second, whether the plaintiff agreed to arbitrate his claims pursuant to the September 30, 2016 Terms of Service.

**II.**

Under 9 U.S.C. § 4, "a district court must enter an order to arbitrate upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 n.27 (1983) (internal quotation marks omitted). Pursuant to the FAA, "a court asked to stay proceedings pending arbitration in a case covered by the Act has essentially four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987) (citations omitted). The first two tasks are at issue here.

"The determination of whether parties have contractually bound themselves to arbitrate a dispute --- a determination involving interpretation of a state law --- is a legal conclusion." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002) (Sotomayor, J.). In answering that question, "the court applies a standard similar to that applicable for a motion

12

for summary judgment. If there is any issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4).

"Arbitration clauses are a matter of contract law and, if valid, should be enforced." DuBois v. Macy's East Inc., 338 F. App'x 32, 33 (2d Cir. 2009) (summary order). "[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002). Thus, "[w]hen deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Under New York law, which the parties agree applies in this case, "A party to an agreement may not be compelled to arbitrate its dispute with another unless the evidence establishes the parties' clear, explicit and unequivocal agreement to arbitrate." God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP, 845 N.E.2d 1265, 1267 (N.Y. 2006) (internal quotation marks omitted). Although the arbitration agreement must be in writing, "There is no requirement that the writing be signed so long as there is other proof that the parties actually agreed on it." Crawford v.

Merrill Lynch, Pierce, Fenner & Smith, Inc., 319 N.E.2d 408, 412

(N.Y. 1974) (internal quotation marks omitted); see also

Rightnour v. Tiffany & Co., No. 16-CV-3527 (JGK), 2017 WL

878448, at *4 (S.D.N.Y. Mar. 6, 2017).

It is common ground that a court rather than an arbitrator

should decide whether a valid agreement to arbitrate existed.

See Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 392 (2d

Cir. 2011). Lyft bears the initial burden of showing the

existence of an agreement to arbitrate. See Crawley v. Macy's

Retail Holdings, Inc., No. 15 CIV. 2228 (KPF), 2017 WL 2297018,

at *4 (S.D.N.Y. May 25, 2017). Conversely, the plaintiff, as the

party "to an arbitration agreement seeking to avoid

arbitration[,] . . . [would] bear[] the burden of showing the

agreement to be inapplicable or invalid." Harrington v. Atl.

Sounding Co., 602 F.3d 113, 124 (2d Cir. 2010). "If a party

refuses to arbitrate, arbitrability of the dispute hinges only

on whether there is an agreement to arbitrate and, if so,

whether the dispute falls within that agreement." U.S. Fire Ins.

Co. v. Nat'l Gypsum Co., 101 F.3d 813, 816 (2d Cir. 1996).

**A.**

Lyft argues that the defendant assented to the February 8,

2016 Terms of Service, including its arbitration provisions, by

clicking the Box adjacent to "I agree to Lyft's Terms of

Service" and then the pink "Next" bar.

14

"While new commerce on the Internet has exposed courts to
many new situations, it has not fundamentally changed the
principles of contract." Register.com, Inc. v. Verio, Inc., 356
F.3d 393, 403 (2d Cir. 2004). Regardless of whether the parties
transacted through the Internet, "Mutual manifestation of
assent, whether by written or spoken word or by conduct, is the
touchstone of contract." Specht, 306 F.3d at 29. "[C]ourts look
to the basic elements of the offer and the acceptance to
determine whether there is an objective meeting of the minds
sufficient to give rise to a binding and enforceable contract."
Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.,
715 N.E.2d 1050, 1053 (N.Y. 1999) (Wesley, J.).[2]

The plaintiff swears that he never read any portion of the
February 8, 2016 Terms of Service, and that he never knowingly
agreed to its provisions. Applebaum Decl. ¶¶ 5-6. There was no
requirement that the plaintiff click on the hyperlink to view

_____

[2] The Court of Appeals in Specht, 306 F.3d at 29, applied
California law. Other decisions cited by the parties applied the
laws of other states, in particular, Illinois. See, e.g.,
Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034 (7th Cir. 2016)
(applying Illinois law). The parties do not argue that there is
a relevant distinction between New York law and the laws of any
of these other states with respect to contract formation that
would alter the mode of analysis. See id. ("Formation of a
contract requires mutual assent in virtually all jurisdictions;
Illinois courts use an objective approach to that question.");
Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015)
(noting that the laws of "New York, California, and Illinois
. . . are substantively similar with respect to the issue of
contract formation"). It is accordingly unnecessary to
distinguish which state's law is being applied in these cases.

the Terms of Service before proceeding. Thus, "where, as here, there is no evidence that the [mobile application] user had actual knowledge of the agreement, the validity of the . . . agreement turns on whether the [application] puts a reasonably prudent user on inquiry notice of the terms of the contract." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014). Determining whether a consumer was on inquiry notice is a "fact-intensive inquiry." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034–35 (7th Cir. 2016); see also Corwin v. NYC Bike Share, LLC, No. 14-CV-1285 (SN), 2017 WL 816134, at *7 (S.D.N.Y. Mar. 1, 2017), reconsideration denied, 2017 WL 1318010 (S.D.N.Y. Apr. 7, 2017).

What it takes for consumers to assent to contractual terms for transactions completed over the Internet, including through mobile applications, has been the subject of frequent litigation across the country over the past decade. Judge Weinstein recently surveyed this extensive case law in Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394-403 (E.D.N.Y. 2015), and identified four "general types of online consumer contracts . . . (a) browsewrap; (b) clickwrap; (c) scrollwrap; and (d) sign-in-wrap." Id. at 394. According to Judge Weinstein:

> *Browsewrap* exists where the online host dictates that assent is given merely by using the site. *Clickwrap* refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. *Scrollwrap* requires users

16

to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. *Sign-in-wrap* couples assent to the terms of a website with signing up for use of the site's services . . . . Id. at 394-95.

As relevant to this case, courts have consistently found scrollwrap agreements enforceable because they present the consumer with a "realistic opportunity" to review the terms of the contract *and* they require a physical manifestation of assent. Id. at 398-99 (collecting cases). By comparison, courts scrutinize the circumstances surrounding an alleged assent to a clickwrap agreement, which does not require the user to review the terms of the proposed agreement; nevertheless, courts have generally found clickwrap agreements enforceable because "[b]y requiring a physical manifestation of assent, a user is said to be put on inquiry notice of the terms assented to." Id. at 397. However, courts have not been consistent in distinguishing between scrollwrap and clickwrap agreements. See id. at 398 (noting that "[s]ome court decisions that use the term 'clickwrap' are in fact dealing with 'scrollwrap' agreements"). For example, the Court of Appeals for the Second Circuit recently blended Judge Weinstein's categories by describing clickwrap agreements as "typically requir[ing] users to click an 'I agree' box after being presented with a list of terms or

conditions of use." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 233 (2d Cir. 2016).

Regardless of the nomenclature, the classification of an online agreement does not conclude the inquiry, nor does the fact a consumer may have clicked a box. A court "cannot presume that a person who clicks on a box that appears on a . . . screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." Sgouros, 817 F.3d at 1035. The presentation of the online agreement matters: "Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of terms reasonably conspicuous." Nicosia, 834 F.3d at 233. "Clarity and conspicuousness of arbitration terms are important in securing informed assent." Id. (quoting Specht, 306 F.3d at 30).

In this case, the alleged agreement is plainly a clickwrap agreement as classified by Judge Weinstein in Berkson: the clickable Box is adjacent to a hyperlink that contained the February 8, 2016 Terms of Service.[3] Only by clicking on the

---

[3] Several of the cases cited by Lyft are distinguishable because they involved scrollwrap agreements. See, e.g., Bar-Ayal v. Time Warner Cable, Inc., No. 03-cv-9905 (KMW), 2006 WL 2990032, at *9 (S.D.N.Y. Oct. 16, 2006); Moore v. Microsoft Corp., 741 N.Y.S.2d 91, 92 (App. Div. 2002). Lyft's reliance on Starkey v. G Adventures, Inc., 796 F.3d 193, 197 n.3 (2d Cir. 2015) --- which

18

hyperlink would the user see the Terms of Service, and the user could proceed without clicking on the hyperlink. The issue is whether the mobile application screen adequately communicated all of the terms and conditions of the purported agreement and whether the purchaser received reasonable notice of those terms. Sgouros, 817 F.3d at 1034.

Evaluating the totality of the circumstances, a reasonably prudent consumer would not have been on inquiry notice of the terms of the February 8, 2016 Terms of Service. Lyft's registration process, as it existed when the plaintiff accessed it in April 2016, did not alert reasonable consumers to the gravity of the "clicks," namely, that clicking the Box and then the pink "Next" bar at the bottom of the screen constituted acceptance of a contract, including an arbitration agreement, governing the parties' obligations going forward. Instead, the design and content of the registration process --- especially compared to the respective processes that existed for the July 28, 2014 Terms of Services and the September 30, 2016 Terms of Service (the latter of which is discussed below) --- discouraged

---

cited Register.com, 356 F.3d at 429, for the proposition that a "clickwrap mechanism" can provide a reasonable means of providing notice and assent --- is likewise unavailing because the Court of Appeals was referring to scrollwrap agreements. See id. ("Essentially, under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product.").

recognition of the existence of lengthier contractual terms that should be reviewed.

Initially, the text is difficult to read: "I agree to Lyft's Terms of Service" is in the smallest font on the screen, dwarfed by the jumbo-sized pink "Next" bar at the bottom of the screen and the bold header **Add Phone Number** at the top. The "Terms of Service" are colored in light blue superimposed on a bright white background, making those "Terms of Service" --- which Lyft argues are the operative words that would alert a reasonable consumer to inquire about a contract --- even more difficult to read.

A reasonable consumer would not have understood that the light blue "Terms of Service" hyperlinked to a contract for review. Lyft argues that coloring words signals "hyperlink" to the reasonable consumer, but the tech company assumes too much. Coloring can be for aesthetic purposes. Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract. See Sgouros, 817 F.3d at 1035 ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them."). Beyond the coloring, there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding,

capitalization, italicization, or large font. Compare Berkson,
97 F. Supp. 3d at 404 (finding that "terms of use" were not made
"readily and obviously available to [the consumer]" where the
"hyperlink to the 'terms of use' was not in large font, all
caps, or in bold" and noting "[b]y contrast, the 'SIGN IN'
button is very user-friendly and obvious, appearing in all caps,
in a clearly delineated box in both the upper right hand and the
lower left hand corners of the homepage"), with Whitt v. Prosper
Funding LLC, No. 1:15-CV-136-(GHW), 2015 WL 4254062, at *1
(S.D.N.Y. July 14, 2015) (finding agreement to arbitrate where
the term "*borrower registration agreement*," was underlined and
shaded blue to signify a hyperlink), and Fteja v. Facebook,
Inc., 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (hyperlink was
underlined and near words to the effect that by clicking on the
sign up button, the consumer is indicating that the consumer has
read and agrees to the Terms of Service).

Contrast Lyft's presentation of the hyperlinked "Terms of
Service" with its treatment of hyperlinks in the February 8,
2016 Terms of Service itself, where Lyft knew how to be clear
that it was providing hyperlinks to other information. For
example, the February 8, 2016 Terms of Service provided that,
"The arbitration shall be conducted by the American Arbitration
Association under its Commercial Arbitration Rules (a copy of
which can be obtained here) . . . ." Ajmani Decl., Ex. 2 ¶ 17.

Rather than providing notice to consumers that they were agreeing to the terms of a contract, the screen with the Box to be checked for "Lyft's Terms of Service" was misleading. The screen was titled in bold terms **"Add Phone Number."** The entire screen was structured as part of a process to verify a phone number, not to enter a detailed contractual agreement. A reasonable consumer would have thought that the consumer had agreed to be contacted by Lyft, specifically, to receive a text message from the company. A consumer would have arrived at this screen after entering personal information on several similar screens; there was nothing to denote that this screen was special or distinguishable from the rest. The **"Add phone number"** screen called upon the consumer to input the consumer's telephone number, with the proviso: "We'll send a text [message] to verify your phone." Only then would the consumer click the Box next to "I agree to Lyft's Terms of Services," which was immediately below Lyft's statement that it was going to contact the consumer. The reasonable inference for the reasonable consumer was that the Terms of Service related only to the text verification because the consumer had just agreed to receive a text message. This conclusion would have been reinforced by the design of the screen, including the inconspicuousness of the hyperlink and the absence of cautionary language to indicate that there were contractual terms for review, let alone

important contract terms. A reasonable consumer may have understood that the consumer had agreed to something, but not to the lengthy February 8, 2016 Terms of Service. See Sgouros, 817 F.3d at 1035-36 ("[W]here a website specifically states that clicking means one thing, that click does not bind users to something else." (citing Lee v. Intelius Inc., 737 F.3d 1254 (9th Cir. 2013)).

Lyft also contends that the fact that a consumer could not click the "Next" bar until after clicking the Box put reasonable consumers on inquiry notice that the screen had added significance in the registration process. That ignores that a consumer could not click "Next" until the consumer had entered his or her phone information for text verification. As Lyft conceded at oral argument, this was true for every screen in the registration process: each screen contained a "Next" bar (or similar prompt), and a consumer could not proceed to the next screen until completing the required fields on each screen. Thus, this limitation would not have alerted a consumer to the significance of the Box, especially given that the word "Next" implied that there were additional steps in the registration process.

There is also no reason to believe that "Terms of Service" is self-defining for reasonable consumers as equivalent to "Binding Contract" or "Final Contract." Judge Weinstein made

this point persuasively in Berkson, 97 F. Supp. 3d at 377-83, noting that similar phrases, such as "terms of use" and "terms and conditions," "especially when presented in lowercase . . . [do] not clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies." Id. at 380.

Likewise, Judge Rakoff reasoned in Meyer v. Kalanick, 200 F. Supp. 3d 408 (S.D.N.Y. 2016), appeal docketed, No. 16-2750 (2d Cir. Aug. 5, 2016) --- a case involving a company that also provided transportation services through a mobile application --- that a court "cannot simply assume that the reasonable (non-lawyer) smartphone user is aware of the likely contents of 'Terms of Service' . . . . The reasonable user might be forgiven for assuming that 'Terms of Service' refers to a description of the types of services that [the company] intends to provide . . . ." Id. at 421.

Stripped of the import ascribed by Lyft, it is apparent that a reasonable consumer would not be on reasonable inquiry notice to search for the terms of a contract on the "**Add phone number**" screen when the consumer clicked the Box.[4]

---

[4] Other cases cited by Lyft are distinguishable on the basis of the prominence of the hyperlinks to the contracts at issue in those cases, with any ambiguity as to their significance cured by other factors, such as the location of the hyperlinks. See, e.g., Starke v. Gilt Groupe, Inc., No. 13 CIV. 5497 (LLS), 2014 WL 1652225, at *1 (S.D.N.Y. Apr. 24, 2014); Saizhang Guan v.

Accordingly, the notice of the proposed contract terms was insufficient to bind the plaintiff to the terms of that agreement, including the arbitration provisions, simply because the plaintiff checked the Box agreeing to Lyft's Terms of Service. <u>See</u> <u>Specht</u>, 306 F.3d at 35 ("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility."). Because a reasonable consumer would not have been on reasonable inquiry notice as to the terms of the February 8, 2016 Terms of Service, the plaintiff cannot be bound by the arbitration provisions in that contract.

**B.**

Lyft argues that the plaintiff assented to the September 30, 2016 Terms of Service, including its arbitration provisions. Here, Lyft is more successful: the plaintiff does not dispute that he agreed to the September 30, 2016 Terms of Service, which were presented to him as a scrollwrap agreement.

---

Uber Techs., Inc., No. 16-cv-598 (PKC), 2017 WL 744564, at *4 (E.D.N.Y. Feb. 23, 2017); <u>Salameno v. Gogo Inc.</u>, No. 16-CV-0487, 2016 WL 4005783, at *3 (E.D.N.Y. July 25, 2016); <u>Selden v. Airbnb, Inc.</u>, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *9 (D.D.C. Nov. 1, 2016); <u>Tompkins v. 23andMe, Inc.</u>, No. 5:13-CV-05682 (LHK), 2014 WL 2903752, at *3 (N.D. Cal. June 25, 2014), <u>aff'd</u>, 840 F.3d 1016 (9th Cir. 2016); <u>Swift v. Zynga Game Network, Inc.</u>, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011).

Lyft's method for presenting existing customers with the September 30, 2016 Terms of Service is very similar to the initial registration processes (such as the 2014 registration process) that Lyft used to present new customers with previous versions of its Terms of Service, before the company implemented the scaled-down and more opaque registration process for the February 8, 2016 Terms of Service.[5] Courts have routinely found that consumers assented to Lyft's contracts that used the previous registration processes.[6] See, e.g., Bekele v. Lyft, 199 F. Supp. 3d 284, 288, 290 (D. Mass. 2016); Loewen v. Lyft, Inc., 129 F. Supp. 3d 945, 948-49 (N.D. Cal. 2015); Frazier v. Lyft, 37-2015-00019783-CU-BT-CTL (S.D. Super. Ct. 2016) (attached as Ajmani Decl., Ex. 4); see also Weiss Decl. ¶¶ 2-3 (describing the registration process at issue in Frazier). The plaintiff offers no basis to distinguish these cases.

The method for presenting the September 30, 2016 Terms of Service to existing customers who had already registered

---

[5] At oral argument, Lyft made clear that its current registration process for new customers still resembles the clickwrap registration process in place for the February 8, 2016 Terms of Service. Thus, Lyft only uses a more informative scrollwrap format to present new versions of its Terms of Services to existing customers, like the plaintiff, who have already registered with Lyft.

[6] Lyft cited these cases --- which analyzed scrollwrap agreements --- for the proposition that courts have approved the registration process for the February 8, 2016 Terms of Service. That was misleading because that registration process did not resemble the previous registration processes addressed by those courts, which had employed scrollwrap agreements.

conspicuously cured the defects in the notice for the February 8, 2016 Terms of Service. Rather than a screen headed "**Add Phone Number**," the September 30, 2016 Terms of Service were presented on a screen titled "Terms of Service," where, given the content and design of the screen, there could be no doubt as to what that phrase signified. The screen explicitly stated: "Before you can proceed you must read & accept the latest Terms of Service." The Terms of Service were set out on the screen to be scrolled through. No subtle hyperlink was needed. The Terms of Service begin with the warning: "These Terms of Service constitute a legally binding agreement . . . between you and Lyft, Inc." Before proceeding, the user was required to click on a conspicuous bar that said: "I accept."

Accordingly, the plaintiff assented to the terms of the September 30, 2016 Terms of Service when he clicked "I accept" on November 22, 2016.[7]

---

[7] Lyft's argument that the plaintiff's assent to the September 30, 2016 Terms of Service showed that he also assented to the February 8, 2016 Terms of Service is unpersuasive. The plaintiff assented to the September 30, 2016 Terms of Service after he had already become aware of the February 8, 2016 Terms of Service, including its arbitration provisions, through this litigation. See Compl. ¶¶ 65-85. Moreover, the September 30, 2016 Terms of Service is a different agreement, with different arbitration provisions, that was presented to him in a completely different manner, namely, as a scrollwrap agreement. The plaintiff's acceptance of a different agreement after he had already become aware of the February 8, 2016 Terms of Service sheds no light on the plaintiff's knowledge at the time he clicked the Box for the February 8, 2016 Terms of Service.

While the plaintiff concedes that he assented to the arbitration provisions in the September 30, 2016 Terms of Service, the plaintiff argues that his claims are outside the scope of that arbitration agreement because the arbitration agreement did not cover disputes that were already subject to litigation. However, the arbitration agreement contained a very broad arbitration clause together with a delegation clause that gave the arbitrators the power to decide issues of arbitrability. Parties may delegate issues of arbitrability, such as the scope of the arbitration, to arbitrators so long as that delegation is clear and unmistakable. Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 79 (2010); Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 211 (2d Cir. 2005).

Here, the delegation is clear and unmistakable; the plaintiff does not argue otherwise. The September 30, 2016 Terms of Service provides: "All disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator . . . ." Although the plaintiff disputes whether his claims are in fact arbitrable, any question about the arbitrability of the plaintiff's claims must be addressed in the first instance by the arbitrators. See Loewen, 129 F. Supp. 3d at 954 (holding

that similar language in an earlier version of Lyft's terms of service delegated issues of arbitrability to the arbitrator).

Accordingly, Lyft's motion to compel arbitration pursuant to the FAA is **granted**.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the parties' arguments are either moot or without merit. For the foregoing reasons, Lyft's motion to compel arbitration pursuant to the FAA is **granted**.

The Clerk of Court is directed to close all pending motions.

The parties should submit a proposed order to the Court by **July 10, 2017**, in accordance with this decision that directs the parties to arbitrate their dispute. If the parties cannot agree to a jointly proposed order, each party may submit a proposed order to the Court by **July 10, 2017**, and any objections to the other side's order by **July 12, 2017**.

The action is **stayed** pending the resolution of the arbitration. See Katz v. Cellco P'ship, 794 F.3d 341, 343 (2d Cir. 2015) (The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested.").

**SO ORDERED.**

**Dated:**    **New York, New York**
         **June 26, 2017**

                              _____/s/_____
                                   **John G. Koeltl**
                              **United States District Judge**